IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cr-20323-JTF-tmp |
| v. | ) | |
| | ) | |
| ANTONIO DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is defendant Antonio Davis's Motion to Suppress. (ECF Nos. 26, 29.) For the reasons below, it is recommended that the motion be denied.

### I.    PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the evidentiary hearing, including the testimony of Memphis Police Department ("MPD") Officers Anthony Williams and Samuel Strickland, as well as the audio-video recording from Officer Williams's Body Worn Camera ("body-cam"). The undersigned finds the testimony of Officers Williams and Strickland to be credible.

On March 3, 2018, the MPD received a 911 call from a complainant who reported that a man was brandishing a firearm at

a park where children were present. The MPD dispatch call identified the complainant by her name and described "three male blacks occupying a white sedan . . . one person was armed with a gun, information from children in the park who saw one person brandishing the firearm. Unknown which subject. No additional descriptions. 292 Williamson Street at Williamson Park." A second dispatch call went out shortly thereafter, again describing:

> [A]n armed party at 292 Williamson Street, Williamson Park, [name redacted] our complainant is advising there are three male subjects in a white sedan, one of which is armed with a gun, information was obtained from children in the park that saw one of the subjects brandishing the firearm . . . in the park, Williamson Park, three male black subjects in a white sedan, one [of] them armed with a gun, brandishing a firearm, 292 Williamson Street.

MPD Officer Anthony Williams, who was on patrol by himself, immediately responded to the call. As he pulled up to the playground area at Williamson Park in his patrol vehicle, he observed a white sedan parked on the grassy area right next to the playground equipment. There were three men (all of whom were African-American), three women, and five children gathered around the playground. Officer Williams testified that he noticed one of the men, later identified as defendant Antonio Davis, closing the door to the sedan and walking toward the group.[1] The other two men

---

[1]At the start of the body-cam recording, Davis can be seen walking away from the white sedan toward the rest of the group by the playground equipment. Because the camera was affixed to Officer William's chest area, the recording initially only shows the patrol

were standing by the playground equipment. (ECF No. 36 ex. 1 at 00:18.) The screen shot below shows the playground area as Officer Williams arrived in his patrol car. Davis is the individual in the gray hooded sweatshirt standing closest to the white sedan.



(ECF No. 36 ex. 1 at 00:15.)

As Officer Williams walked up to the group, he could see that Davis was wearing jeans and a baggy sweatshirt that covered his waistband area. The second man was shirtless and the third man had on a close-fitting, long-sleeve t-shirt. Officer Williams testified that he visually inspected each of the men's waistband area because that is where guns are usually hidden. Officer Williams immediately focused his attention on Davis because he was

---

car's steering wheel as Officer Williams parked and exited his vehicle, and thus does not show Davis closing the door. The court finds credible Officer Williams's testimony that he saw Davis closing the door.

- 3 -

the only individual who had his waistband area covered and thus could have been hiding a gun. The screen shot below shows how the three men were dressed when Officer Williams encountered the group.[2]



(ECF No. 36 ex. 1 at 01:51.)

Officer Williams called out to Davis and told him to "come over here for me, sir." (ECF No. 36 ex. 1 at 00:33.) Davis did not respond. (ECF No. 36 ex. 1 at 00:35.) Officer Williams told the group that he was responding to a 911 call reporting that somebody near a white sedan was brandishing a gun at the park. (ECF No. 36 ex. 1 at 00:40.) One of the women denied that anyone had a gun. (ECF No. 36 ex. 1 at 00:43.) Officer Williams continued to call out to Davis and stated that he wanted to pat him down because he

---

[2]All faces other than Davis's are redacted.

was "the only one with a jacket." (ECF No. 36 ex. 1 at 00:50.) Davis replied by stating, "I don't have no gun. I just got out of jail." (ECF No. 36 ex. 1 at 00:54.) At this point, Officer Williams called for backup and told Davis that he wanted him to step to the side so that he could be patted down for a gun. (ECF No. 36 ex. 1 at 01:11.) Davis told Officer Williams, "I can't go to jail." (ECF No. 36 ex. 1 at 01:27.) He also repeatedly stated, "Hell nah" and "I can't go," refusing to comply with Officer William's instructions.

The group then began walking toward the white sedan, at which time Officer Williams reached for Davis's hands. (ECF No. 36 ex. 1 at 01:51-01:58.) Davis quickly moved away to avoid being grabbed. (ECF No. 36 ex. 1 at 02:04.) Officer Williams eventually was able to restrain Davis by his arms and shoulders as Davis approached the white sedan. (ECF No. 36 ex. 1 at 02:05.) Davis then stated, "I got this man's gun on me." (ECF No. 36 ex. 1 at 02:30.) Officer Samuel Strickland arrived a few seconds later. (ECF No. 36 ex. 1 at 02:34.) Together, the officers placed Davis in handcuffs. (ECF No. 36 ex. 1 at 02:48.) Officer Strickland then patted down Davis and found a gun tucked in his waistband.[3] (ECF No. 36 ex. 1 at 02:56.) Davis was subsequently indicted by a federal grand jury

---

[3]After the gun was found in Davis's waistband, Davis can be heard on the body-cam making statements inferring that the gun actually belonged to one of the other men and that he took possession of it sometime before Officer Williams arrived.

with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and possession of a firearm after being convicted of misdemeanor domestic violence in violation of 18 U.S.C. § 922(g)(9). (ECF No. 1.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. Standard of Review

In his Motion to Suppress, Davis argues that the officers violated his Fourth Amendment rights by stopping him and then frisking him for weapons. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Warrantless searches are "'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). One such exception is an investigatory stop and frisk for weapons. Terry v. Ohio, 392 U.S. 1, 30 (1968). In order for a stop and frisk to be constitutional, two requirements must be met: (1) the stop must be lawfully made with reasonable suspicion that the searched person has committed or is about to commit a criminal offense; and (2) the searching officer must reasonably believe that the person is armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 366 (2009). "Ultimately, the test is whether 'a reasonably prudent [person] in

the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'" United States v. Pacheco, 841 F.3d 384, 390 (6th Cir. 2016) (quoting United States v. Noble, 762 F.3d 509, 521–22 (6th Cir. 2014)).

## B.   Reasonable Suspicion

The parties do not dispute that Davis was stopped within the meaning of Terry when Officer Williams first placed his hands on Davis's arms and shoulders as Davis approached the white sedan. See United States v. Johnson, 620 F.3d 685, 690 (6th Cir. 2010) (breaking the reasonable suspicion inquiry into two parts: when the stop occurred and whether there was reasonable suspicion at that time). The question, then, is whether Officer Williams had the requisite reasonable suspicion at that moment to justify the stop and frisk. When considering what constitutes reasonable suspicion, "[c]ourts must determine from the totality of the circumstances whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing." United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2004) (citing United States v. Arvizu, 534 U.S. 266, 273–77 (2002) and United States v. Orsolini, 300 F.3d 724, 728–29 (6th Cir. 2002)). Reasonable suspicion can arise "not only from the officer's 'own direct observations,' but also 'from such sources as informant tips, dispatch information, and directions from other officers.'" United

States v. Phillips, 553 F. App'x 533, 534-35 (6th Cir. 2014) (quoting Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008)).

The court finds that Officer Williams had reasonable suspicion that Davis had a gun on him, which under the circumstances would mean that there was reasonable suspicion Davis had committed a crime (at the very least, Reckless Endangerment, T.C.A. § 39-13-103) and was armed and dangerous. The MPD dispatch call relayed information from a named 911 caller. See United States v. Chaplin, No. 1:16-CR-00001-GNS, 2017 WL 9360839, at *3 (W.D. Ky. Feb. 21, 2017) (citing Feathers v. Aey, 319 F.3d 843, 849 (6th Cir. 2003) and Florida v. J.L., 529 U.S. 266, 270 (2000)) (noting that "[t]he weight to be afforded a tip falls along a broad spectrum" and that tips from known informants are more reliable than tips from anonymous sources, especially when coupled with an indicia of reliability). The 911 caller provided detailed information that three black men were in a white sedan at a specific park (Williamson Park) with children present and that the children saw one of the men brandishing a gun. Officer Williams responded quickly to the park, and what he observed corroborated the 911 caller's information: he saw three African-American men standing with several women and children near the playground equipment, he saw a white sedan, and he saw Davis closing the door

- 8 -

to the sedan as he (Davis) walked toward the group.[4] See Pacheco, 841 F.3d at 392-93 ("[If] an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity."); United States v. Bradshaw, No. 3:18-CR-34-RGJ, 2018 WL 7297866, at *2-3 (W.D. Ky. Nov. 30, 2018) (citing United States v. McMullin, 739 F.3d 943, 947 (6th Cir. 2014) and United States v. Moore, 817 F.2d 1105, 1106 (4th Cir. 1987)) (stating that there is more likely to be reasonable suspicion where an officer "swift[ly] respon[ds] to reliable reports of criminal activity"). Officer Williams focused on Davis because, of the three men, Davis was the only one who had his waistband area covered by an article of clothing. In addition, as can be seen and heard on Officer Williams's body-cam, Davis was evasive when Officer Williams repeatedly asked him to come over to be patted down, and after being informed by Officer Williams that he was there to investigate a report of someone having a gun, Davis started walking away from the officer and stated, "I can't go to jail."[5] Based on

---

[4]The court finds that even if Officer Williams had not, in fact, observed Davis closing the door to the white sedan as the officer approached the park, the dispatch call and the officer's other observations would have nevertheless provided him with reasonable suspicion to conduct the stop and frisk.

[5]On its own, walking away from a police encounter cannot create reasonable suspicion. Jacobs v. Vill. of Ottawa Hills, 5 F. App'x 390, 395 (6th Cir. 2001). However, walking away from a police officer can create reasonable suspicion if there are "specific

- 9 -

the 911 call and Officer Williams's observations, a reasonable officer would have suspected that Davis was armed with a gun.

As the foregoing analysis illustrates, this is not a case where an officer based his reasonable suspicion solely on an uncorroborated anonymous tip or a defendant's mere presence in an area. See United States v. Patterson, 340 F.3d 368, 371-72 (6th Cir. 2003) (no reasonable suspicion where an officer responded five hours after an anonymous tip and "merely observed a group of individuals walking away from the area" and "throwing an object away"); see also United States v. Noble, 762 F.3d 509, 522 (6th Cir. 2014) ("[A] person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green

---

facts [showing] that the defendant's behavior was otherwise suspicious." United States v. Beauchamp, 659 F.3d 560, 570 (6th Cir. 2011). For example, in United States v. Smith, 594 F.3d 530 (6th Cir. 2010), the Sixth Circuit held that an officer who was responding to an emergency had reasonable suspicion for a stop where the suspect, upon seeing the officer, "attempted, with his head down, to push his way through and past the officers." Id. at 541; see also Phillips, 553 F. App'x at 535 (noting that a suspect exiting a parking lot immediately upon seeing a police officer pull in "could add to reasonable suspicion"). Likewise, in United States v. Stittiams, 417 F. App'x 530 (6th Cir. 2011), the Sixth Circuit held that a police officer had reasonable suspicion to frisk a suspect when he was "responding to a specific call reporting a crime involving a weapon, and an individual [was] seen taking evasive behavior in response to the police's arrival." Id. at 536. The Sixth Circuit stated that the question is not whether the suspect's actions could have an innocent explanation, but rather whether "his actions, viewed from a reasonable officer's viewpoint, indicated flight from a crime scene, criminal activity or some other suspicious circumstance." Id. at 534-35 (citing United States v. Luqman, 522 F.3d 613, 617 (6th Cir. 2008)).

light for frisking that person[.]"); <u>United States v. Williams</u>,
731 F.3d 678, 687 (7th Cir. 2013) (no reasonable suspicion where
"the situation looked much different than had been reported during
the 911 call" and "the officers had practically no reason to
believe that any of the remaining individuals were armed and
dangerous"). Nor, as Davis suggests, is this a case where an
officer based his reasonable suspicion purely on a particular
article of clothing worn by the defendant. <u>See</u> <u>Ybarra v. Illinois</u>,
444 U.S. 85, 93 (1979) ("At the suppression hearing, the most Agent
Johnson could point to was that Ybarra was wearing a 3/4-length
lumber jacket, clothing which the State admits could be expected
on almost any tavern patron in Illinois in early March."). Rather,
Officer Williams's reasonable suspicion to stop and frisk Davis
was based on a combination of several factors, including the
reliable and corroborated 911 call, his observations of Davis's
obstructed waistband compared to that of the other possible
suspects, Davis's evasive behavior, and the statements Davis made
while walking away. <u>See</u> <u>United States v. Lujan</u>, No. 4:17-cr-37,
2018 WL 3742452, at *6 (E.D. Tenn. Aug. 7, 2018) (quoting <u>Arvizu</u>,
534 U.S. at 274–76) ("[E]ven conduct that can have an innocent
explanation can support reasonable suspicion when it is '[t]aken
together' with suspicious but otherwise innocent factors.'").

### III. RECOMMENDATION

For the reasons above, it is recommended that Davis's Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham_____
TU M. PHAM
Chief United States Magistrate Judge

November 12, 2020_____ _____
Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**