**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-cr-20323-JTF-tmp** |
| | ) | |
| **ANTONIO DAVIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION,
DENYING DEFENDANT'S OBJECTIONS, AND DENYING DEFENDANT'S
MOTION TO SUPPRESS**

Before the Court is Defendant Antonio Davis's Motion to Suppress, filed on June 14, 2020. (ECF No. 26.) The Motion was referred to the Chief Magistrate Judge on June 17, 2020. (ECF No. 29.) On June 25, 2020, the United States filed its Response to Defendant's Motion. (ECF No. 30.) The Magistrate Judge held a hearing on Defendant's Motion on August 28, 2020. (ECF No. 35.) On September 14, 2020, Defendant filed his Supplemental Submission in Support of Motion to Suppress. (ECF No. 38.) On November 12, 2020, the Magistrate Judge issued a Report and Recommendation denying Defendant's Motion to Suppress. (ECF No. 41.) Defendant timely filed his Objections to Report and Recommendation on December 10, 2020. (ECF No. 45.)

For the following reasons, and after a *de novo* review of the record, the Court **ADOPTS** the Chief Magistrate Judge's Report and Recommendation, **DENIES** Defendant's Motion to Suppress, and **DENIES** Defendant's Objections.

1

## **LEGAL STANDARD**

Congress passed 28 U.S.C. § 636(b) "to relieve some of the burden on the federal courts by permitting the assignment of certain district court duties to magistrates."  *United States v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001).  Pursuant to the provision, magistrate judges may hear and determine any pretrial matter pending before the Court, except various dispositive motions. 28 U.S.C. § 636(b)(1)(A).  Regarding those excepted dispositive motions, magistrate judges may still hear and submit to the district court proposed findings of fact and recommendations for disposition.  28 U.S.C. § 636(b)(1)(B).  Upon hearing a pending matter, "[T]he magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact."  Fed. R. Civ. P. 72(b)(1); *see also Baker v. Peterson*, 67 F. App'x 308, 310 (6th Cir. 2003).  Any party who disagrees with a magistrate's proposed findings and recommendation may file written objections to the report and recommendation.  Fed. R. Civ. P. 72(b)(2).

The standard of review that is applied by the district court depends on the nature of the matter considered by the magistrate judge.  *See Baker*, 67 F. App'x at 310 ("A district court normally applies a 'clearly erroneous or contrary to law' standard of review for nondispositive preliminary measures.  A district court must review dispositive motions under the *de novo* standard." (citations omitted)).  Motions to suppress evidence are among the motions in criminal cases that are subject to *de novo* review.  *See* 28 U.S.C. § 636 (b)(1)(A); *U.S. Fid. & Guarantee Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1088 (6th Cir. 1992).  Upon review of the evidence, the district court may accept, reject, or modify the proposed findings or recommendations of the magistrate judge.  *Brown v. Bd. of Educ.*, 47 F. Supp. 3d 665, 674 (W.D. Tenn. 2014); *see also* 28 U.S.C. § 636(b)(1).  The court "may also receive further evidence or recommit the matter to the [m]agistrate [j]udge with instructions."  *Moses v. Gardner*, No. 2:14-cv-2706-SHL-dkv, 2015 U.S.

2

Dist. LEXIS 29701, at *3 (W.D. Tenn. Mar. 11, 2015). As for consideration of factual objections, "[w]hen reviewing a magistrate judge's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate judge's determinations, while recognizing a magistrate judge is in the better position to assess the credibility of witnesses he sees and hears." *United States v. Johnson*, No. 10-20176, 2011 U.S. Dist. LEXIS 97577, at *6 (W.D. Tenn. Aug. 30, 2011) (citation omitted). A district judge should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. *Brown*, 47 F. Supp. 3d at 674.

## **FACTUAL OBJECTIONS**

In his Report and Recommendation, the Chief Magistrate Judge sets forth proposed findings of fact as stated during the August 28, 2020 hearing. (ECF Nos. 35 & 41.) As explained below, this Court overrules Defendant's objections and adopts and incorporates those proposed findings of fact.

Defendant objects to the Chief Magistrate Judge's assignment of credibility to Officer Williams' testimony asserting he saw Defendant close the door to the white sedan. (ECF Nos. 41, 2–3 n.1 & 45, 10–13.) Images from Officer Williams' body camera do not show Defendant closing the white sedan door. (ECF No. 41, 2–3.) Defendant states that the Affidavit of Complaint and Officer Williams' contemporaneous statements at the scene do not support Officer Williams' testimony that he saw Defendant close the sedan door.[1] (ECF No. 45, 11–13.) However, Officer Williams testified that he did not press start on the body camera until he arrived at the park.[2] He

---

[1] At the suppression hearing, Officer Williams testified that "when I pulled on the scene, [Defendant] was in control of the vehicle." (ECF No. 39, 29.) Defendant also points to Officer Williams' statement to another officer, as captured by the body camera footage, that Defendant was not in the car. (ECF No. 45, 12.) However, this is not inconsistent with the assertion that Defendant was shutting the sedan door as Officer Williams arrived, and further, the Magistrate Judge did not find that Defendant was in control of the vehicle. (ECF No. 41, 2–3.)

[2] The Chief Magistrate Judge noted that until Officer Williams exited the car, the body camera—because it is placed on Officer Williams' chest—recorded only the police vehicle's steering wheel while Officer Williams drove up to the

testified that prior to pulling up and exiting the car, he drove past the park and was able to observe the individuals on the playground.  (ECF No. 39, 43.)  The Court is mindful that "[w]hen reviewing a magistrate judge's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate judge's determinations, while recognizing a magistrate judge is in the better position to assess the credibility of witnesses he sees and hears."  *Johnson*, 2011 U.S. Dist. LEXIS 97577, at *6 (citation omitted).  Given Defendant's proximity to the sedan and his subsequent movement from the sedan to the individuals on the playground, an inference can be made that Defendant was shutting the door and moving away from the sedan as Officer Williams arrived.  (*See* ECF No. 41, 2–3 n.1.)  Ultimately, the Court finds that the Chief Magistrate Judge did not err in crediting Officer Williams' testimony that he observed Defendant shut the sedan door.  The Chief Magistrate Judge also found that "even if Officer Williams had not, in fact, observed [Defendant] closing the door to the white sedan . . . the dispatch call and the officer's other observations would have nevertheless provided him with reasonable suspicion."  (*Id.* at 9 n.4.)  As such, and as explained in the analysis below, the Court agrees with the Chief Magistrate Judge's finding that reasonable suspicion existed at the time of the stop, regardless of any observation of Defendant closing the sedan door.  Accordingly, Defendant's first Objection is **DENIED**.

Second, Defendant objects to the Chief Magistrate Judge's finding that after "visually inspecting" the waistbands of the men at the scene, "Officer Williams immediately focused his attention on [Defendant] because he was the only individual who had his waistband area covered and thus could have been hiding a gun."  (ECF Nos. 41, 3–4 & 45, 13.)  Defendant takes issue with Officer Williams' testimony that he singled out Defendant only after visually inspecting the men's

_____

park.  (ECF No. 41, 2–3 n.1.)  Thus, any observation of Defendant accessing the white sedan would not have been captured by the body camera.  The Court agrees with this finding of fact.

waistbands, because according to Defendant, when Officer Williams gestured to Defendant, Officer Williams remained too far away to see the men's waistbands. (ECF No. 45, 16.) However, the Court finds that the Chief Magistrate Judge did not err in crediting this aspect of Officer Williams' testimony. The distance shown in the Report and Recommendation is not so great as to overcome the ability to see, as argued by the Defendant. (*See* ECF Nos. 41, 3 & 45, 15–16.) Defendant further objects to crediting Officer Williams' testimony that one of the other men at the scene had his shirt tucked into his pants. Defendant states that this individual's shirt was not tucked in and that his waistband was not exposed. (ECF No. 45, 17–19.) During the suppression hearing, Officer Williams testified that based on body camera images, "it appears his shirt was not tucked into his jeans." (ECF No. 39, 48.) However, Officer Williams also testified that, as to this unnamed man, "I could see more of his clothing than I could of [Defendant]," due to his shirt being tighter than Defendant's loose-fitting hooded sweatshirt. (*Id.* at 53.) The Court concludes that the Chief Magistrate Judge did not err in crediting Officer Williams' testimony that he visually inspected the men's waistbands. The Court finds that Officer Williams was not too far away to compare the men's waistbands, and that furthermore, Defendant's waistband was substantially less discernible compared to the other two men, since one man was shirtless and the other unidentified man's shirt was—although not tucked in—considerably tighter, shorter, and more revealing of the waistband than Defendant's hooded sweatshirt.[3] (*See* ECF No. 41, 4.)

Defendant also contends that Officer Williams' subsequent frisk of the unidentified individual with the tighter shirt undercuts the assertion that Officer Williams visually inspected the men's waistbands. (ECF No. 45, 17–20.) The Court finds Officer Williams' subsequent frisk of the unidentified individual immaterial. Officer Williams' decision to frisk this individual does

---

[3] The Court has viewed and considered the photographs included in the Report and Recommendation and Defendant's Objections and reaches the same conclusion. (*See* ECF Nos. 41, 4 & 45, 18–19.)

not undercut the assertion that Officer Williams visually inspected the men's waistbands and recognized that Defendant's waistband was the least discernible.  The frisk of the unidentified man is not inconsistent with Officer Williams' testimony that he visually inspected the men's waistbands to determine which individual was most likely to possess a gun.  The Court finds that the Chief Magistrate Judge did not err in crediting Officer Williams' testimony that he inspected the men's waistbands and that Defendant was the only man whose waistband was exposed.  Accordingly, Defendant's Objection on this issue is **DENIED**.

<u>ANALYSIS</u>

Defendant contends that the Chief Magistrate Judge's Report and Recommendation erred in concluding that Officer Williams' stop and frisk of Defendant was supported by reasonable suspicion.  (ECF No. 45, 23.)  Overall, Defendant argues that:  (1) the conduct characterized by the Chief Magistrate Judge as evasive was not evasive or relevant to the reasonable suspicion inquiry; (2) there existed no reasonable suspicion that Defendant was engaged in criminal activity or armed and dangerous; and (3) the totality of the circumstances does not support the conclusion that Officer Williams possessed reasonable suspicion.  (*Id.* at 8–9, 21, 23.)  As indicated below, the Court agrees with the Report and Recommendation that Defendant's conduct was evasive and that under the totality of the circumstances, there existed reasonable suspicion to support a *Terry* stop and frisk.

*Report and Recommendation's Conclusion that Defendant was Evasive*

Defendant objects to the Magistrate Judge's conclusion that Defendant was evasive during the encounter with Officer Williams.  (ECF No. 45, 21.)  Defendant contends "[t]he R&R construed [the verbal exchange and physical movement of Defendant] as demonstrating [Defendant's] 'evasive[ness]' justifying a *Terry* frisk for weapons."  (*Id.* at 22.)

6

"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted). It is also true though that in the context of a "consensual conversation with an inquisitive officer," one has the right to simply walk away. *See Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001) (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). Further, "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citations omitted). The Sixth Circuit has explained that some factors, such as simply walking away from police, are "so innocent" that without more, they should be "outrightly dismissed" in examining the existence of reasonable suspicion. *See United States v. Patterson*, 340 F.3d 368, 371–72 (6th Cir. 2003) (citing *United States v. Smith*, 263 F.3d 571, 593–94 (6th Cir. 2001)). However, the situation changes when suspicious conduct accompanies otherwise innocent behavior. *See Smith*, 263 F.3d at 593 (holding that while "perfectly innocent behavior" is alone insufficient to provide reasonable suspicion, such behavior may contribute to reasonable suspicion when combined with other factors). As explained below, the circumstances alleged to support reasonable suspicion are not viewed separately in isolation, but rather as a "unified whole." *See Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012).

In this case, Defendant's attempt to walk away from Officer Williams, standing alone, could not provide reasonable suspicion. But this conduct, coupled with the information known to Officer Williams from the armed party call, his observations upon arriving at Williamson Park, and Defendant's statements indicating that he did not have a gun and "I can't go to jail" clearly provided Officer Williams with reasonable suspicion to conduct a pat-down of Davis. (ECF Nos. 41, 5 & 45, 7.) *See United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) ("We view the evidence offered in support of reasonable suspicion using a commonsense approach, as understood

by those in the field of law enforcement."). It was not Defendant's desire to avoid an encounter with police that alone provided reasonable suspicion but rather, Defendant's conduct in light of surrounding suspicious circumstances, which are further explored below. *See United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011) ("In those cases in which we have found that walking away from police does contribute to reasonable suspicion, specific facts have shown that the defendant's behavior was otherwise suspicious.").

Defendant also contends that he did not flee from Officer Williams and cites *United States v. Gleason*, No. 12-20099-STA-dkv, 2013 U.S. Dist. LEXIS 42780, at *26 (W.D. Tenn. Feb. 28, 2013), for the proposition that movement short of flight cannot create reasonable suspicion. (ECF No. 45, 22.) However, flight does not necessarily mean running away from police, and the term can encompass walking away from an officer. *See United States v. Stittiams*, 417 F. App'x 530, 535 (6th Cir. 2011) (per curiam) (finding an officer could have reasonably concluded that defendant was fleeing when the defendant ignored a request to stop and walked away). Further, *Gleason* and other cases recognize that moving away from police can contribute to reasonable suspicion when there are other suspicious factors present. *See Gleason*, 2013 U.S. Dist. LEXIS 42780, at *26. The Court finds that Defendant's conduct, including statements indicating an unwillingness to go jail and movement away from the officer and towards others on the playground, is properly considered as evasive behavior in examining whether Officer Williams' suspicions were reasonable, especially in light of the preceding 911 call reporting an armed party. (ECF No. 41, 3–5)

The Chief Magistrate Judge's Report and Recommendation did not rely solely on the conclusion that Defendant was evasive in finding that there was reasonable suspicion to support a *Terry* stop and frisk. (*See* ECF No. 41, 9, 9–10 n.5.) The Chief Magistrate Judge considered

Defendant's evasiveness alongside other factors supporting reasonable suspicion.  (*See id.* at 10–11.)  Accordingly, the Chief Magistrate Judge did not err in concluding that Defendant's behavior was evasive and supportive of reasonable suspicion, and Defendant's Objection is **DENIED**.

<u>*Reasonable Suspicion Supporting a Terry Stop and Frisk*</u>

Defendant contends that the Report and Recommendation erred in finding reasonable suspicion to support the stop and frisk of Defendant.  (ECF No. 45, 23.)  A stop and frisk is permissible if the police officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009).  "An officer must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect."  *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014).  Reasonable suspicion "requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'"  *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  In determining whether reasonable suspicion existed to justify an investigatory stop and frisk, courts examine the "totality of the circumstances." *Arvizu*, 534 U.S. at 273.

The controlling inquiry in this case is whether Officer Williams had reasonable suspicion at the time of the seizure of Defendant. *See United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010).  The Report and Recommendation indicates that "[t]he parties do not dispute that [Defendant] was stopped within the meaning of Terry when Officer Williams first placed his hands on [Defendant's] arms and shoulders as [Defendant] approached the white sedan." (ECF No. 41, 7.)  Thus, the Court must determine whether Officer Williams possessed reasonable suspicion that justified a stop and frisk when he physically contacted Defendant. *See Johnson*, 620 F.3d at 690

("A person is seized when an officer 'by means of physical force or show of authority, has in some way restrained [his] liberty.'" (quoting *Terry*, 392 U.S. at 19 n.16)).

By the time Officer Williams touched Defendant, several circumstances supported his belief that reasonable suspicion existed to conduct a pat-down: (1) the 911 call placed by a named individual stating that there was an armed party in Williamson Park among a group of three African-American men near a white sedan, to which there was quick police response; (2) Officer Williams' personal observations when he arrived at the park, which verified most of the information in the 911 call; (3) Defendant's proximity to the white sedan upon Officer Williams' arrival; (4) Officer Williams' observation that Defendant's waistband was not visible, unlike the other two men at the park; and (5) Defendant's evasiveness and statement that he could not go to jail.

As to the 911 call alleging an armed party at the park, the Court finds that it properly supports a finding of reasonable suspicion. In addition to an officer's own observations, reasonable suspicion "can be based on informant tips and dispatcher information." *Smoak*, 460 F.3d at 779 (citing *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998)). Generally, tips provided to police must bear sufficient "indicia of reliability." *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (analyzing an anonymous tip's reliability). While tips provided by confidential, unknown informants warrant the least amount of credibility without predictive information, the situation is markedly different where information is provided by a named caller through the 911 system. *See United States v. Jackson*, 700 F. App'x 411, 414 (6th Cir. 2017) (contrasting the reliability of an anonymous tip with that of a 911 call made by an ascertainable person (citing *Navarette v. California*, 572 U.S. 393, 397–401 (2014))). Further, where information is conveyed to police about an event shortly after the event's occurrence, its reliability is strengthened. The

reliability of the information is strengthened even more when police quickly arrive and verify details of the call. *See Robinson v. Howes*, 663 F.3d 819, 829–30 (6th Cir. 2011) (explaining that "an informant's proximity in time and space to the reported criminal activity" can contribute to a tip's reliability).

The facts that the caller was a named individual and that Officer Williams was aware of such from the dispatch message also lend credence to the reliability of the information conveyed in the call. *See Navarette*, 572 U.S. at 401 ("[A] reasonable officer could conclude that a false tipster would think twice before using [the 911 system]."); *Srisavath v. City of Brentwood*, 243 F. App'x 909, 916 (6th Cir. 2007) (finding no reasonable suspicion and emphasizing that the police officer testified the supporting tip was anonymous). Additionally, the caller's description of the scene indicated that there were three African-American men with a white sedan in the park, which—while insufficient in itself to provide reasonable suspicion—contributed to the reliability of the call because it implied that the caller had physical proximity to and firsthand observation of the park. *See Robinson*, 663 F.3d at 829–30. Further, the caller conveyed an accurate depiction of the scene, as verified through Officer Williams' observations. *See United States v. Pacheco*, 841 F.3d 384, 392–93 (6th Cir. 2016) (holding a confidential informant's tip that described the "make, model, and color of the vehicle" plus "the number of occupants to expect, along with their ethnicity" and location bolstered the tip's assertion of illegality and contributed to reasonable suspicion). Finally, and most importantly, the 911 call is not the sole factor supporting reasonable suspicion in this case.

Defendant argues that any suspicion directed at him was based on his presence in a group, and therefore, there was no reasonable suspicion particularized to him. (ECF No. 45, 8–10.) Defendant points to the fact that the dispatch indicated it was unknown which of the three men in

the group was armed.  (*Id.* at 9.)  In support, Defendant cites *Ybarra v. Illinois*, 444 U.S. 85 (1979), *Patterson*, 340 F.3d 368 (6th Cir. 2003), and *Noble*, 762 F.3d 509 (6th Cir. 2014).[4]  (*Id.* at 8–9.)

It is true that a hooded sweatshirt is a common item of clothing and that wearing one does not imply criminality, but the Court finds *Ybarra* inapplicable to this case.  In *Ybarra*, officers searched a bar and its bartender for drugs—not weapons—pursuant to a search warrant, which was obtained upon information from a reliable informant alleging drug activity.  444 U.S. at 88.  During the search, police also frisked the defendant, a bargoer who happened to be in the establishment at the time.  *Id.* at 89.  In support of the argument that police had reasonable suspicion that the defendant was armed and dangerous, "the most [the officer] could point to was that [the defendant] was wearing a 3/4-length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March."  *Id.* at 93.  In this case, and unlike the situation in *Ybarra*, the government does not point merely to Defendant's clothing or his presence at a location to support reasonable suspicion.  Here, given all of the information Officer Williams possessed, including contents of the 911 call, his on-scene observations, and Davis' evasive actions, it was reasonable to believe that Defendant was the armed individual reported in the 911 call.

*Patterson* is also readily distinguishable.  In that case, officers responded to an anonymous tip alleging drug activity at an intersection.  *Patterson*, 340 F.3d at 370.  Unlike the contemporaneous police response in the case at bar, the officers in *Patterson* arrived at the

---

[4] Defendant also cites the Seventh Circuit's decision in *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013).  Aside from being non-binding authority, *Williams* is distinguishable.  First, the underlying tip was a 911 call in which the caller "refused to provide her name."  *Williams*, 731 F.3d at 681.  Second, in responding to the call, police "observed a much different scene than that reported."  *Id.*  Finally, aside from the anonymous 911 call, the government relied on the defendant's nervousness and the "group's general behavior."  *Id.* at 687.  Overall, the defendant had not personally behaved suspiciously.  *See id.* at 687–89.  In the present case, however, the scene at the park was substantially similar to the named caller's description, and Defendant notably stated that he could not go to jail while taking evasive action.

intersection over five hours after the tip and observed a group of African-American men begin to walk away from the street corner. *Id.* The officers witnessed one of the men, but not the defendant, make "a throwing motion towards the bushes." *Id.* at 369–70. The officers then stopped and frisked all of the men. The Court held that "[w]ithout the anonymous tip, the officers merely observed a group . . . walking away from the area," and that the officers lacked "individualized suspicion" as to the defendant. *Id.* at 371–72. In this case, however, there was a contemporaneous response to a 911 call from an identified individual rather than a delayed response to an anonymous tip. Further, Officer Williams' suspicion of Defendant did not arise from the actions of the other two men, but rather from Defendant's own proximity to the sedan, evasiveness, statements, and imperceptible waistband.

Finally, the Court finds that *Noble* is distinguishable because, while it involved a known informant, the initial information provided by the informant turned out to be inaccurate. *See Noble*, 762 F.3d at 514. *Noble* also involved a drug investigation rather than a 911 call response to an armed individual, and in fact, the informant indicated that he had no knowledge of weapon possession. *Id.* at 514–15. Further, the investigating officer's conduct was inconsistent with a suspicion that the defendant was armed and dangerous, because the officer returned to his police vehicle and then performed a field sobriety test after noticing the defendant's nervousness. *Id.* at 523. Additionally, the defendant was not one of the targets of the drug investigation, and there was no information indicating that he had any link to drug activity. *Id.* at 514, 524–25. Here, as noted above, the 911 call indicated three African-American men were in the park, one armed with a firearm. Officer Williams acted consistently with the information he possessed.

Ultimately, as explained, the relevant inquiry is whether reasonable suspicion existed at the moment of the seizure. Officer Williams was aware of a 911 call placed by a named citizen

reporting an armed party among three African-American men in a white sedan near children at Williamson Park.  (ECF No. 41, 1–2.)  Shortly afterward, Officer Williams arrived at Williamson Park and saw three African-American men near a white sedan and children on the playground.  At that point, Officer Williams not only knew that the source of information was a named caller through the 911 system, but also that the caller's description of the scene was accurate—short of the firearm.  Therefore, it was not unreasonable for Officer Williams to believe that the 911 caller was also correct in the assertion that one of the three African-American men was armed. Proceeding from there, Officer Williams was unable to see the waistband of only one of the three African-American men present—Defendant—who was also the individual shutting the sedan door.[5]  In addition to these circumstances, Defendant stated that he could not go to jail and began walking away from Officer Williams, moving to stand behind other individuals at the park.

The Court finds that in considering the totality of the circumstances, Officer Williams reasonably suspected that Defendant was the armed party reported by the call and was engaged in criminal activity.[6]  Therefore, there was reasonable suspicion to support the investigatory stop. Because Officer Williams reasonably suspected that Defendant was the armed party, the Court also finds that Officer Williams reasonably suspected that Defendant was armed and dangerous. Further, the frisk was limited to a pat-down of Defendant's outer clothing to search for a weapon.

---

[5] As indicated, the Chief Magistrate Judge concluded that even if Officer Williams had not observed Defendant close the sedan door, reasonable suspicion would still exist in this case.  The Court agrees.  Defendant's proximity to the sedan makes reasonable the inference that Defendant had just accessed the car.  Furthermore, the fact that he was the closest individual to the sedan is relevant, because it further links Defendant to the 911 caller's description of the scene.

[6] The Court notes that Tennessee law generally prohibits the possession of weapons in public parks unless otherwise authorized.  *See* TENN. CODE ANN. § 39-17-1311.  The Chief Magistrate Judge also noted that because Officer Williams reasonably suspected that Defendant possessed a firearm, "there was reasonable suspicion [Defendant] had committed a crime," possibly Reckless Endangerment under TENN. CODE ANN. § 39-13-103.  (ECF No. 41, 8.)  As discussed above, based on the totality of the circumstances, it was reasonable for Officer Williams to suspect Defendant of criminal activity.

14

*See Terry*, 392 U.S. at 30.  Accordingly, both the stop and frisk of Defendant were constitutionally permissible.

## **CONCLUSION**

Upon *de novo* review, the Court hereby **ADOPTS** the Magistrate Judge's Report and Recommendation to **DENY** Defendant's Motion to Suppress and **DENIES** Defendant's Objections.


**IT IS SO ORDERED** on this 22nd day of January 2021.


*s/John T. Fowlkes, Jr.*
John T. Fowlkes, Jr.
United States District Judge

15